David **STOCK**

v.

**UNIVERSAL FOODS CORPORATION,**
**et al.**

No. L–92–557.

United States District Court,
D. Maryland.

March 31, 1993.

Charles B. Zuravin, Columbia, MD, for plaintiff.

Leslie W. Gawlik, Baltimore, MD, for defendants.

## MEMORANDUM

LEGG, District Judge.

This case illustrates the sometimes conflicting and murky dictates of the employment discrimination laws. Pursuant to an affirmative action plan ("AAP"), Universal Foods Corporation ("Universal") hired a minority (black) worker. A rejected white applicant brought the instant reverse discrimination suit pursuant to 42 U.S.C. §§ 1981 and 1985(3).

Defendants filed, on April 1, 1992, a motion to dismiss. This Court's July 24, 1992 order gave notice to the parties that the Rule 12(b)(6) motion was being converted to a motion for summary judgment because it

presents matters outside of the pleadings. *See* Fed.R.Civ.P. 56. Plaintiff thereafter filed, on August 24, 1992, a cross-motion for summary judgment.

After a review of the papers on file, this Court finds that no hearing is necessary, *see* Local Rule 105.6 (D.Md.), and that summary judgment for defendants is appropriate. This case is governed by the rule that an employer may hire a qualified minority worker over a more qualified majority worker if the employer is acting pursuant to a bona fide (i.e., remedial) AAP.

## I. FACTS

Plaintiff David Stock ("Stock") is a white male who unsuccessfully sought a position as a maintenance mechanic at Universal's Red Star Yeast plant in Baltimore. Stock, whose experience as a tool and dye maker qualifies him for the job, contends that he was rejected solely because of his race.

Defendant Kenneth Randall ("Randall") is Universal's Plant Manager. Defendant Dennis Cassidy ("Cassidy") is Universal's General Superintendent, and is responsible for the implementation of Universal's AAP. Defendant Ronald C. Miller ("Miller") is Universal's Maintenance Superintendent; he supervises the maintenance mechanics.

Universal bought the Red Star Yeast plant in 1981 from Diamond Shamrock. At that time, it was the practice at the plant to recruit new employees by word of mouth. As a result, new employees were typically friends or relatives of old employees. One consequence of this practice was an almost complete absence of minorities and women in the work force. When Universal bought the plant, there were only two minority employees.

Although Universal's management made some effort to recruit minority employees, the company did not adopt a formal affirmative action program until 1991, after an Equal Employment Opportunity Commission ("EEOC") audit revealed violations of Executive Order 11246 and various federal fair employment statutes and regulations. In an effort to remedy these violations and to avoid potential legal liability, Universal, on June 28, 1991, entered into a conciliation agreement with the EEOC. Under that agreement, Universal developed and adopted an AAP, which described Universal's past deficiencies, its new hiring policies, and its hiring goals for fiscal year 1991.[1]

The May 1991 workforce analysis, prepared for the EEOC audit, reflected an underutilization of minorities in the "craft" category. Of the twenty-one craft positions at the Baltimore plant, only two were filled by blacks. Four of the last six craft hires were white, two black. At Universal, maintenance mechanics were included in the craft category. All of the fourteen maintenance mechanics were white; the two previous hires for the position were white.

Universal's AAP provides that the primary considerations in hiring decisions are knowledge, skill, job competence, willingness to work, and the ability to work with others. In an effort to meet Universal's hiring goals and its need for a competitive workforce, the AAP provides that each employee shall be competent and shall have experience which demonstrates qualifications for the job, including loyalty and productivity. The AAP specifically states that its goals are not rigid quotas, but are rather targets "reasonably attainable by means of applying every good faith effort to make all aspects of the entire affirmative action program work."

In late August or early September, 1991 a position in the plant's maintenance department became available. This position was for a general mechanic on the night shift whose primary responsibility is servicing the packaging equipment. This night mechanic works alone, in contrast to the day shift mechanics who work in pairs. About half of the Universal plant's maintenance mechanics are "papered" machinists, the other half are

---

**1.** One requirement of the AAP was that all job openings be listed with the Maryland State Job

not.[2] The two previous hires into the maintenance department were not papered.

The night shift position became available when a day shift machinist quit and the old night shift machinist switched to the day shift. Neither of these two men were papered. A night shift machinist, therefore, could effectively perform the job without being a papered machinist.

Despite the AAP requirement that all job openings be listed with the state job service and be advertised, Stock learned about the Universal job opening from Preston Sealover ("Sealover"), a Universal maintenance mechanic, who told Stock that Universal was looking for a journeyman machinist. Sealover approached Stock after Miller asked his maintenance mechanics whether they knew anyone who would be interested in filling the department's vacancy.

Miller, who was unfamiliar with the new AAP, interviewed Stock for the open position on September 9, 1991. Miller told Stock he was impressed with Stock's qualifications and arranged for Stock to be interviewed the next day by the plant manager, Allan Brethauer ("Brethauer"). After this second interview, Miller again told plaintiff that everything "looked good," and Miller began arranging for a physical examination for Stock.

It then came to the attention of Dennis Cassidy, the Assistant Plant Manager, that Miller had interviewed an applicant before the position had been publicly advertised.[3] Cassidy contacted Miller and informed him of the AAP's requirements. Miller in turn told Stock that the company needed to advertise and interview more applicants to comply with its affirmative action plan, but that Miller was still very impressed by plaintiff's qualifications.

Universal listed the opening with the Maryland State Job Service, and placed a print advertisement in the Baltimore *Sun* on September 14 and 15, 1991. The ad read:

MACHINIST–MECHANIC

Familiarity with high speed packaging equipment preferred. Experience in plant maintenance is essential. Hours will be primarily third shift.

The Maryland State Job Services ad was similar, though not as detailed regarding specific qualifications.

Some thirty-two men applied. After reviewing the applications, Miller chose the five men who were most qualified on paper and interviewed them. Of these applicants, three were journeyman machinists and two were tool and dye makers. Miller thereafter told both Stock and the maintenance workers at Universal that Stock was still the most qualified applicant.

None of the initial interviewees were minority group members. This fact, Cassidy suspected, was not because there were no qualified minority applicants, but rather because Miller was prejudiced and had weeded out applicants who appeared on paper to be minorities.[4] Consequently, Cassidy urged Miller to find qualified minority applicants and call them in for interviews. At no time, however, did Cassidy tell Miller that he must hire a minority.

Miller went back through the applications and located two he suspected had been submitted by blacks.[5] On October 10, 1991, Miller asked Sealover to apologize to Stock for the delay in a hiring decision, and to inform him that Universal intended to interview a black applicant in order to comply with its AAP.

Tyrone Anderson ("Anderson") was interviewed and subsequently hired by Universal for the maintenance vacancy. Anderson, who is black, had vocational training from a respected school and had production line equipment experience. His former employer

---

Service and advertised in the newspaper.

**2.** A "journeyman machinist", also called a "papered machinist," is a machinist who has completed an apprenticeship and extra course work.

**3.** At this time, Cassidy was unaware of Stock's race.

**4.** The applications did not list the race of the applicants.

**5.** Miller testified at deposition that one of the applicants was named Tyrone, and the second had worked at a well-known black owned business.

gave him an unqualified recommendation and expressed disappointment that he was leaving. Despite his admitted prejudice against minorities, Miller was impressed by Anderson's qualifications and decided Universal should hire him. Anderson began work on November 4, 1991.

Although the other maintenance mechanics were upset that a black man had been chosen,[6] Anderson soon impressed them with his quality work and amiable personality.[7] There have been no complaints about Anderson's work since the initial grumbling.

The essence of Count I of Stock's complaint is that Tyrone Anderson was not qualified for the maintenance mechanic position.[8] The undisputed material facts of this case, however demonstrate beyond legitimate dispute that (i) Anderson was qualified, (ii) Universal's AAP was bona fide, and (iii) Anderson was hired pursuant to the plan. Accordingly, all defendants are entitled to summary judgment.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608,

26 L.Ed.2d 142 (1970); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). In determining whether such an issue exists, the Court must view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co., Inc. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987); *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir.1985).

Only facts which bear on the outcome of the suit under the applicable law are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material factual dispute is "genuine" only if a reasonable jury could return a verdict for the non-moving party based upon the evidence presented in opposition to the motion for summary judgment. *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252, 106 S.Ct. at 2512.

When the non-moving party will bear the burden of proof at trial, he must present evidence, in the form of affidavits, depositions, or otherwise, identifying specific facts which create a genuine issue for trial. *Celotex*, 477 U.S. at 317, 106 S.Ct. at 2548. The moving party is entitled to judgment as a matter of law when the non-moving party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*

### B. COUNT I: 42 U.S.C. § 1981

█ Stock alleges that Universal Foods, in violation of § 1981, refused to hire him for a job vacancy solely on the basis of his race.[9]

---

**6.** As an example of the atmosphere in the maintenance shop, Sealover testified at his deposition that prior to Anderson's employment with Universal, the maintenance shop was an all-white shop where many employees referred to blacks as "niggers." Sealover Dep. at 30.

**7.** When surveyed, Anderson's co-workers expressed satisfaction with his work and character.

**8.** Plaintiff, in his motion for summary judgment, contends that "the clumsy manner in which Defendants went about hiring a minority, any mi-

nority, ... in conjunction with the waiver of the basic job requirement made it perfectly clear that no majority applicant would be considered for the opening thus completely barring whites from the vacancy and invidiously trammeling their interests."

**9.** Section 1981 provides in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full

Plaintiff contends that he was not hired into the position for which he interviewed solely because he is white, and that Tyrone Anderson was hired for that position solely because he is black. Despite its language "as is enjoyed by white citizens," § 1981 prohibits intentional racial discrimination against whites in hiring decisions. *See Mc-Donald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).[10]

A § 1981 plaintiff must prove that he is a victim of intentional race discrimination. *General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Memphis v. Greene,* 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981). This may be done through direct or indirect evidence of an intent to discriminate. *Cooper v. Federal Reserve Bank,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) (§ 1981 plaintiff may use proof scheme outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981)); *Wilson v. Bailey,* 934 F.2d 301, 304 (11th Cir. 1991); *Lewis v. Central Piedmont Community College,* 689 F.2d 1207 (4th Cir.1982); *Payne v. Blue Bell, Inc.,* 550 F.Supp. 1324, 1324 n. 1 (M.D.N.C.1982).

### 1. *Applicable Law*

The most commonly used and best understood proof scheme in a discrimination case is the one announced by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Because direct proof of discrimination is usually difficult to produce, the *McDonnell Douglas* burden shifting scheme, which allows a plaintiff to proceed with circumstantial evidence, was an important development in discrimination law.

Under the *McDonnell Douglas* scheme, a plaintiff must carry the initial burden of creating an inference that the challenged employment decision was based on a discriminatory criterion. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Cline v. Roadway Express, Inc.,* 689 F.2d 481 (4th Cir.1982); *Blue Bell,* 550 F.Supp. at 1325. A minority plaintiff bringing a failure to hire suit under § 1981 raises an inference of discrimination by establishing (i) that he is a minority (ii) who applied for and was qualified for a job, (iii) that he was rejected for the job, and (iv) that the job was filled by a non-minority candidate.

The burden of production then shifts to the employer to come forward with a legitimate non-discriminatory reason for its decision. If the defendant does this, then the plaintiff must prove by a preponderance of the evidence that the reason offered by the employer is a pretext, masking discriminatory motive, and is unworthy of credence. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Tuck v. Henkel Corp.,* 973 F.2d 371 (4th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1276, 122 L.Ed.2d 671 (U.S. Feb. 22, 1993); *Wilson v. Bailey,* 934 F.2d 301, 304 (11th Cir.1991). Throughout the inquiry, the plaintiff bears the ultimate burden of proving intentional racial discrimination by a preponderance of the evidence.

and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

**10.** Section 1981 was amended in 1991. That amendment was enacted, and became effective, November 21, 1991. The Fourth Circuit has not yet decided which version of § 1981 should be applied to a case such as this, where suit was brought after the new § 1981 was enacted, but which complains of preenactment behavior.

In this case, it is of no consequence which version of § 1981 applies because the only substantive change in § 1981 is that the newly enacted version extends protection to post-contract formation behavior, while the old version protects only pre-contract formation behavior. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Williams v. First Union Nat'l Bank of N.C.,* 920 F.2d 232, 234 (4th Cir.1990) (old § 1981 does not apply to post-formation behavior). Here, Stock never entered into a contract with Universal, so he complains only of pre-formation behavior.

■ In the context of a reverse discrimination suit brought pursuant to § 1981, the Court must decide whether the *McDonnell Douglas* test applies. The Eleventh Circuit has held that a white plaintiff is entitled to the same inference of discrimination as a minority plaintiff when he proves a prima facie case. *Wilson v. Bailey*, 934 F.2d 301, 304 (11th Cir.1991).

Other courts, including the Courts of Appeals for the District of Columbia Circuit and the Sixth Circuit have held, however, that a white male plaintiff who otherwise makes out a prima facie case is not entitled to an inference of discrimination. Those courts reason that the *McDonnell Douglas* proof scheme is premised upon this country's history of racial discrimination against minority groups, particularly blacks. Thus, they apply *McDonnell Douglas* to the minority but not the majority. *See Donaghy v. City of Omaha*, 933 F.2d 1448, 1458 (8th Cir.1991); *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63 (6th Cir.1985); *Warsocki v. City of Omaha*, 726 F.2d 1358, 1360 and n. 3 (8th Cir. 1984); *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C.Cir.1983) ("it defies common sense to suggest that the [hiring] of a black employee justifies an inference of prejudice against [white applicants] in our present society"); *Setser v. Novack Inv. Co.*, 657 F.2d 962, 968 (8th Cir.) (en banc), *cert. denied*, 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981); *Parker v. Baltimore & O.R.R.*, 652 F.2d 1012, 1017 (D.C.Cir.1981) ("Membership in a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was predicated.").

The Sixth Circuit and the District of Columbia Circuit have held that a reverse discrimination plaintiff raises an inference of impermissible racial discrimination when he satisfies the *McDonnell Douglas* prima facie case and also shows that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d at 67; *Lanphear v. Prokop*, 703 F.2d at 1315; *Parker v. Baltimore & O.R.R.*, 652 F.2d at 1017.

Whether a white plaintiff is entitled to an inference of impermissible racial discrimination when he satisfies the *McDonnell Douglas* prima facie case is a question of first impression in the Fourth Circuit. This Court will apply the standard *McDonnell Douglas* test. In this Court's view, the extra factor required by the Sixth, Eighth, and District of Columbia Circuits is vague and difficult to apply. The *McDonnell Douglas* test is well-established, generally understood, and also focuses attention upon the bona fides of the defendant's AAP, which, in a reverse discrimination case, is the usual "legitimate reason" cited by the employer for its hiring decision.

■ In the reverse discrimination context, therefore, the plaintiff raises an inference of racial discrimination when he proves:

(1) that he belongs to a class;

(2) that he applied for and was qualified for a job;

(3) that he was rejected for the job; and

(4) that the job was filled by a minority group member.

*See Wilson v. Bailey*, 934 F.2d 301, 304 (11th Cir.1991). Once this inference is raised, the employer must come forward with a legitimate, nondiscriminatory reason for the hiring decision. In the instant case, Universal has done this by adverting to its AAP. Thus, the burden of persuasion rests on the plaintiff to prove that (i) the AAP is not bona fide, or (ii) the AAP was not followed in the instant case. *See Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (ultimate burden remains on employees to demonstrate the Title VII violation or the unconstitutionality of an affirmative-action program); *Donaghy v. City of Omaha*, 933 F.2d at 1458; *Setser*, 657 F.2d at 969.

■ An AAP is bona fide if it is substantially related to its remedial purpose. *Valentine v. Smith*, 654 F.2d 503, 510 (8th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). An AAP is substantially related to a remedial purpose if:

(1) its implementation results or is designed to result in the hiring of a sufficient number of minority applicants so that the

racial balance of the employer's work force approximates roughly, but does not exceed, the balance that would have been achieved absent the past discrimination; (2) the plan endures only so long as is reasonably necessary to achieve its legitimate goals; (3) the plan does not result in hiring unqualified applicants; and (4) the plan does not completely bar whites from all vacancies or otherwise unnecessarily or invidiously trammel their interests.

*Valentine v. Smith,* 654 F.2d at 510.[11]

■■■ A defendant satisfies his burden of production by coming forward with facts which would tend to establish each of the elements set forth above.[12] This would include evidence that the AAP was a response to a conspicuous racial imbalance in the workforce,[13] and that the plan is reasonably tailored to cure this imbalance. *See Donaghy v. City of Omaha,* 933 F.2d at 1458; *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 279–81, 106 S.Ct. 1842, 1849–50, 90 L.Ed.2d 260 (1986) (plurality); *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 507, 109 S.Ct. 706, 728, 102 L.Ed.2d 854 (1989) (narrowly tailored affirmative action plan of public employer required). An AAP is bona fide if its goals and timetables are reasonably related to the racial imbalance of the work force, the availability of qualified applicants, and the number of positions expected to become available. *Setser v. Novack Inv. Co.,* 657 F.2d 962 (8th Cir.) (*en banc*) *cert. denied,* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981).[14]

Decisions by courts that have grappled with reverse discrimination law reflect the difficulties in practical application of the relevant legal standards. For example, there is disagreement between the Eighth and District of Columbia Circuits over the meaning of "invidiously trammelling the interest of whites." [15]

■■ Because private employers are faced with the dilemma of (i) losing valuable federal contracts or facing suits by minorities if they do not adopt an affirmative action program, or (ii) facing suits by whites if they adopt such programs, the courts are reluctant to discourage experimentation by employers seeking to remedy past discrimination. *See Fullilove v. Klutznick,* 448 U.S. 448, 491, 100 S.Ct. 2758, 2781, 65 L.Ed.2d 902 (1980); *Setser v. Novack Inv. Co.,* 657 F.2d at

---

**11.** *See also United Steelworkers of America v. Weber,* 443 U.S. 193, 209, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979) (AAP may not unnecessarily trammel the rights of white applicants); *Lilly v. City of Beckley,* 797 F.2d 191 (4th Cir.1986) (an affirmative action plan is bona fide, and therefore a legitimate non-discriminatory reason for hiring a minority, where the plan does not trammel the rights of non-minorities, is designed to remedy past discrimination, and is temporary).

**12.** Formal allocation of the burden of production to the defendant makes sense because the defendant is in possession of the relevant facts. Additionally, the discussion in a reverse discrimination case will inevitably focus on the bona fides of the AAP, so the defendant would invariably bring these facts forward.

**13.** An employer may demonstrate past discrimination through work force analysis evidencing under-representation of minorities in certain job categories. *See Johnson v. Transportation Agency, Santa Clara County,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987).

**14.** The Fourth Circuit has held that *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), "represents an accommodation of the principle that past discrimination against racial minorities should be rectified with the need for substantive and procedural safeguards for racial majorities in implementation of affirmative action plans. Time limitations and numerical goals are obvious means by which the safeguards insisted upon in *Weber* can be realized." *Lilly v. City of Beckley,* 797 F.2d 191, 195 (4th Cir.1986).

**15.** The Eight Circuit applies the following bright line test: an affirmative action plan invidiously trammels the rights of whites when it either (i) requires firing whites to make room for minorities, (ii) deprives present employees of employment rights or benefits they already enjoy, or (iii) completely bars whites from all available positions. *See Valentine v. Smith,* 654 F.2d 503, 511 (8th Cir.1981).

The District of Columbia Circuit has held, however, that it "do[es] not believe that *Weber* supports the proposition that no purported affirmative action plan is ever unlawful unless it requires discharge, permanently bars advancement, or maintains racial balance." *Parker,* 652 F.2d at 1014. Under this approach, it is marginally easier for a white plaintiff to prove that an AAP trammels the interests of whites, but this test has never been applied, so its precise contours remain undefined.

969–70. Therefore, the court, not the jury, decides whether or not an affirmative action plan is valid. *Donaghy v. City of Omaha,* 933 F.2d 1448, 1458 (8th Cir.1991); *Setser v. Novack Inv. Co.,* 657 F.2d at 969.

### 2. *Defendants' Motion for Summary Judgment*

The disposition of defendants' motion for summary judgment turns upon two issues: (i) whether Universal's AAP is bona fide, and (ii) whether the Universal employees were acting pursuant to the AAP when they hired Anderson.

Stock contends (i) that Anderson was not qualified for the maintenance mechanic position, (ii) that Universal's employees acted for a discriminatory, and not a remedial, purpose when they implemented Universal's affirmative action plan (i.e., that they did not act pursuant to the AAP), and (iii) that implementation of Universal's program unnecessarily trammelled the rights of white applicants (i.e., the AAP is not bona fide).

■ Plaintiff offers no direct evidence of intentional racial discrimination, so he must proceed according to the *McDonnell Douglas* proof scheme. Here, plaintiff Stock satisfies the four part *McDonnell Douglas* scheme. He (i) applied for the open position, (ii) was undeniably qualified for the job, (iii) was rejected, and (iv) the job was filled by a black applicant.

■ Because Stock has met his initial burden of raising an inference of impermissible racial discrimination, Universal must enunciate a legitimate, non-discriminatory reason for its decision not to hire Stock. Universal satisfies this burden by presenting evidence that the challenged employment decision was made pursuant to its bona fide AAP.

■ Plaintiff concedes that Universal's AAP, on its face, is bona fide. This Court holds that it is bona fide. Universal has demonstrated that its affirmative action plan was implemented in response to past discrimination and that the plan is substantially related to its remedial purpose. Defendants present uncontroverted evidence that (i) Universal's affirmative action plan was adopted following a negative audit by the EEOC; (ii) Universal had historically discriminated against women and minorities; (iii) Universal presently underutilizes women and minorities in many work areas, including the craft positions; (iv) Universal's affirmative action program sets annual hiring goals, but does not contain hiring quotas; and (v) it is of finite duration.

Because this Court finds that Universal has presented sufficient evidence to sustain its burden of production, the ultimate burden of persuasion rests on Stock to prove either that the AAP is not bona fide, or that it was not followed in this case. In this summary judgment context, that means that Stock must present sufficient evidence on which a reasonable jury could find that the AAP is not bona fide or was not followed. He fails to do so.

■ Stock's first contention is that Universal's AAP is not bona fide because it invidiously trammels the rights of white applicants. "[A] plan designed to eliminate past racial discrimination is not invalid merely because some innocent persons bear the brunt of the racial preference." *Valentine v. Smith,* 654 F.2d 503, 511 (8th Cir.1981), citing *Fullilove v. Klutznick,* 448 U.S. 448, 484, 100 S.Ct. 2758, 2777, 65 L.Ed.2d 902 (1980). No reasonable jury could conclude, based upon the available evidence, that whites were completely barred from maintenance positions. Two-thirds of the recent craft job openings were filled by whites. Most significantly, Universal's AAP contained hiring goals, not quotas.

■ Stock next challenges Anderson's hiring on the ground that the defendants did not follow the AAP. He supports this argument with the contention that Anderson is unqualified. This Court finds that Anderson is qualified as the maintenance man on the "midnight shift," who alone is responsible for maintenance of the plant's packing equipment. It is unreasonable to suppose that a company would intentionally hire an unqualified man for such a crucial position. Furthermore, Universal's satisfaction with Anderson's job performance is undisputed.

Stock's assertion that the maintenance mechanic position requires a journeyman machinist or a tool and dye maker is alone insufficient to raise a genuine issue of material fact concerning the necessary qualifications for the job. The man who held the night mechanic position before Anderson was not a papered machinist. Indeed, half of the machinists in the department were not papered machinists. Moreover, the advertisements for the position did not state that training as a journeyman machinist or tool and dye maker was required. Thus, plaintiff's contention that Tyrone Anderson is unqualified for the position fails as a matter of law.[16]

Furthermore, each individual defendant stated in his sworn affidavit that he thought he was acting in furtherance of Universal's affirmative action plan. This is not contradicted by deposition testimony. Finally, Stock supplied no direct or circumstantial evidence indicating that defendants intended to hire only a black, even if unqualified.

Plaintiff puts great emphasis on the fact that after the five most qualified applicants, all of whom were white, were interviewed, Miller went back through the previously rejected applications to locate minority candidates. This fact leads nowhere so long as Anderson was qualified and his hiring was consistent with Universal's AAP, which this Court has found to be remedial. When a bona fide AAP is involved, courts consistently uphold promotion schemes where minority candidates are promoted ahead of white candidates with higher test scores. This case is not materially different. Universal and its employees are permitted to prefer a qualified minority applicant over a more qualified white applicant. That is exactly what occurred in Stock and Anderson's case.

The instant case is not unlike *Donaghy v. City of Omaha*, 933 F.2d 1448 (8th Cir.1991), where the Eighth Circuit affirmed the district court's grant of a directed verdict for the defendant when there was testimony at trial that a minority applicant was chosen for a position and promoted "because he was qualified and because [the officials] believed his promotion was required by the [consent] decree." 933 F.2d at 1459.[17] In the instant case, Anderson was qualified for the job and Universal's AAP encouraged the hiring of qualified minority applicants.

In conclusion, Stock fails to present sufficient evidence to raise any genuine issue of material fact for a jury. In a case where an employer has an AAP in place, it may hire a qualified black worker over a more qualified worker without running afoul of § 1981.[18] Here, Universal acted pursuant to a bona fide AAP. Accordingly, defendants' motion for summary judgment on Count I of the complaint will be GRANTED by separate order.

### 3. *Plaintiff's Cross–Motion for Summary Judgment*

Because this Court has granted defendants' motion for summary judgment as to Count I, plaintiff's cross-motion for summary judgment wills necessarily be DENIED as to Count I by separate order.

### C. COUNT II: 42 U.S.C. § 1985(3)

#### 1. *Corporate Defendant/*

Plaintiff concedes it is a legal impossibility for a corporation to conspire with its employees. Plaintiff, therefore, consents in its motion for summary judgment to dismissal of Universal as a defendant in Count II.

---

16. Stock would have this Court hold that a company can hire only "the most qualified" individual for a position, even where the company has an affirmative action program aimed at remedying a long history of discrimination against minorities. A company acting pursuant to an affirmative action plan is not required to hire or promote the most qualified applicant, only a qualified applicant.

17. The consent decree was the city's AAP.

18. This Court is sympathetic to the plight of employers who must attempt to follow the murky "damned if you do, damned if you don't" dictates of employment discrimination law. Employers with AAPs must still litigate whether their AAPs are bona fide, but such are the requirements of our discrimination statutes which require that each individual case be litigated on its facts.

### 2. *Individual Defendants/*

 A prima facie case under § 1985(3) [19] requires, *inter alia,* an allegation of racial or other class-based discriminatory animus underlying the conspirators' actions. *See United Bhd. of Carpenters & Joiners, Local 610 v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Mears v. Town of Oxford,* 762 F.2d 368, 374 (4th Cir.1985). Stock alleges that the process which led to the decision not to hire him was racially motivated. A § 1985(3) plaintiff, however, must also show that he is a member of a class that has suffered historically pervasive discrimination. *Brownell v. State Farm Mutual Ins. Co.,* 757 F.Supp. 526 (E.D.Pa.1991). Stock, a white male, is not a member of a class that has suffered historically pervasive discrimination.

Accordingly, defendants' motion for summary judgment will be GRANTED as to Count II of the complaint, plaintiff's motion for summary judgment will be DENIED as to Count II of the complaint, and judgment will be entered for all defendants and against the plaintiff on Count II of the complaint.

### III. CONCLUSION

There are no genuine issues of material fact and this case is therefore appropriate for summary judgment. Accordingly, plaintiff's motion for summary judgment will be DENIED, and defendants' motion for summary judgment will be GRANTED, and judgment will be entered against plaintiff and for defendants, by separate order.

---

**19.** Section 1985(3) provides in relevant part:

> If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person ... of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).